W. H. TAYLOR et al., Appellees, v. INDEPENDENT SCHOOL DISTRICT OF EARLHAM et al., Appellants.

**APPEAL AND ERROR:** Reservation of Grounds—Corporate Legal-
1   ity—Quo Warranto or Equity. That *quo warranto* and not an equitable action for injunctional relief is the only remedy to test the legality of a public corporation, may not be raised for the first time on appeal.

**STIPULATIONS:** Subject—State of the Law. Principle recognized
2   that parties may not stipulate as to what is public law.

SCHOOLS AND SCHOOL DISTRICTS:    Consolidation—Size of Re-
3 maining Corporation—Prohibition.    The statutory prohibition
that, in the formation of a consolidated school district, no school
*corporation* shall be left with less than four contiguous govern-
ment sections (Section 2794-a, Code Supplement, 1913), has no
application to a *subdistrict* of a school district township.

ELECTIONS:    Qualifications of Voters—Residence—Schools and
4 School Districts.    The constitutional requirement that a citizen
shall have resided in the county in which he proposes to vote,
for 60 days preceding the election, is an *absolute* requirement—
just as absolute as the requirement that he shall have reached
the age of 21 years.    Where a proposed consolidated school dis-
trict comprised territory within two adjoining counties, *held*
that an elector who had resided in the proposed district for
more than 60 days, but had moved from one county to the other
less than 60 days prior to the election to consolidate, was not
qualified.

ELECTIONS:    Definition—Voting on School Consolidation.    Voting
5 on a proposal to create a consolidated school district is an "elec-
tion," within the meaning of the constitutional provision which
prescribes the qualifications for electors.    (Art. 2, Sec. 1, Con-
stitution.)

ELECTIONS:    Right of Suffrage—When Nonexistent.    Principle
6 recognized that no one would have the right to vote at an elec-
tion (a) if it was not a constitutional election, (b) if the legis-
lature had fixed no voting qualifications for voters, and (c) if
the legislature had not provided for voting without qualifica-
tions.

ELECTIONS:    Qualifications of Voters—Construction of Statute—
7 Schools and School Districts.    The statutory creation of an elec-
tion, with proviso that only "voters" shall vote thereat, without
more, manifests a clear intent to treat such election as a con-
stitutional one—a clear intent to adopt the constitutional re-
quirements governing the qualifications of electors.

ELECTIONS:    Qualifications of Voters—Residence—Intention—Tem-
8 porary Inability to Consummate.    A citizen who wholly aban-
dons his residence in one county with no intention to return
thereto, and, with his family, moves to another county with
the good-faith intention to there take up his home, becomes a
resident of such latter county at once, upon his arrival at his
intended abiding place, even though, for reasons not under his
VOL. 181 IA.—35

control, he was *temporarily* unable to fully consummate said latter intention by physically remaining in said latter county.

LADD, J., dissents as to the effect of the record facts. .

PRINCIPLE APPLIED:  One Cook wholly abandoned his residence in Union County, with no intention to return thereto, because of having contracted to work from March 1st in Madison County for one Wilson.  Apparently, Wilson had contracted to furnish Cook with a house in which to reside.  When Cook, with his family, arrived at the house in Madison County, on January 23d, he found it occupied by another person, whose right of occupancy did not expire until March 1st.  With the aid of Wilson, an arrangement was had on the same day with the occupant, under which Cook stored his household goods in said house until he could take undivided possession.  Having so stored his goods, except the clothing for himself and family, Cook and his family, on the same day, went to Dallas County and there boarded and lodged with a relative until February 29th following, when he and his family returned to said house in Madison County and took full possession.  The going to Dallas County and remaining was with the uninterrupted intention to return to said house in Madison County immediately upon its vacation by the other occupant.

*Held*, Cook became a resident of Madison County on January 23d, and not on February 29th.

APPEAL AND ERROR:  Parties Who May Allege Error—Non-Appealing Party.  Principle recognized that an appellee, *without presentation of error points*, may show, if he can, that he was so erred against as to entirely neutralize any errors against appellant.  Applied when appellant, in an election contest, was able to show that the trial court had erroneously *rejected* one vote, and appellee countered with a showing that the trial court had erroneously *accepted* one vote. .

ELECTIONS:  Qualification of Voters—Residence—Intention to Return—Temporary Absences.  One's voting residence is at the place which he treats as his home and to which he intends at all times to return when not employed at other places.  Evidence reviewed, and held not to show legal residence in the district where the election was held.

*Appeal from Madison District Court.* — J. H. APPLEGATE, Judge.

MONDAY, OCTOBER 29, 1917.

THIS is a suit in equity, in which plaintiffs seek and had injunctive relief to prevent certain of the defendants from acting as officers of the so-called Consolidated Independent School District of Earlham, the prayer for relief being bottomed on the claim that said consolidated district has no legal existence. Defendants appeal.—*Affirmed.*

*John A. Guiher, J. W. Rhode,* and *Strock, Wallace & McConlogue,* for appellants.

*John B. White* and *J. P. Steele,* for appellees.

SALINGER, J.—I. The petition alleges: (1) That a pretended consolidated district has no legal existence, because the proposal to create it failed to receive the sanction of a legal majority of the voters; (2) that, despite this, a pretended election was held to name school directors for said pretended district; (3) that defendants claim, on account of said pretended elections, to be directors and officers of said pretended district; (4) that these are threatening and proceeding to discontinue the use of schoolhouses and the maintenance of schools heretofore and now existing and being maintained in an independent district now claimed to be a part of the consolidated district; (5) that they are threatening to sell, dispose of and remove said schoolhouses and to discontinue the schools heretofore and now maintained in each of named subdistricts located near the homes of the plaintiffs, and thereby to deprive plaintiffs of convenient and valuable school privileges for their school children, and require plaintiffs to send such children many miles away for their school privileges; (6) that they are about to proceed to erect extensive and expensive school buildings, at great cost to these plaintiffs and other electors residing within the territory attempted to be included within the pretended consolidated independent district; (7) that they will cause taxes to be levied

to pay therefor, and these plaintiffs and all other property owners within the pretended district will sustain great and irreparable loss by being compelled to pay a heavy tax to support and maintain the proposed school: and that this will all be done unless defendants are restrained by injunction. Plaintiffs pray an injunction and decree restraining defendants from assuming to act as a board of directors of the pretended consolidated district; from taking any further steps in the organization of the pretended school corporation; restraining them from tearing down or disposing of the school buildings aforesaid; from erecting any buildings or directing the levy of any taxes in favor of the pretended consolidated district; from interfering in any way with the property or the maintaining of schools in described territory pretended to be included in the consolidation; and that the court "adjudge all proceedings in which it was attempted by a pretended election to organize said Consolidated Independent District of Earlham to be void and of no effect." General equitable additional relief is prayed. A decree was entered substantially as prayed, and which holds, among other things, that the election upon which the defendants claim to be directors was illegal and without authority of law, that all steps taken and proceedings had were and should be set aside and held for naught. The consolidated district itself was perpetually enjoined and restrained from assuming to act as such district, and, as said, there is a restraining order granting, in substance, all that was prayed.

1-a

The petition was in no manner assailed. No objection was made below that a court of equity could not give the relief sought. But it is urged on the appeal that the court had no jurisdiction, and that, therefore, we must pass upon the point, though it was

1. APPEAL AND ERROR: reservation of grounds: corporate legality: *quo warranto* or equity.

not raised below.   This is true only if the trial court had no power to do what it did.   In so holding, we do not overlook that whether a school corporation has been legally formed is a question of public law; that failure·to object

2. STIPULATIONS: subjects: state of the law.

is,. in a sense, consent; and that parties cannot settle by consent what public law is. See *Tuttle v. Pockert,* 147 Iowa 41, 43; *Ford v. Dilley,* 174 Iowa 243, at 250; *Heiman v. Felder,* 178 Iowa 740, at 752; *State v. Aloe,* (Mo.) 54 S. W. 494.   This rule is not in conflict with the one that will not permit a point other than a jurisdictional one to be first made on appeal.   It but means that, if a question of public law *is* mooted below, we are not bound to settle it as the parties agreed it should be.   It does not mean that an issue tendering what is public law must be passed upon on appeal, though it was not tendered in the trial court.

In *Nelson v. Consolidated Ind. School Dist.,* 181 Iowa 424, it is settled that *quo warranto* alone affords a remedy where the sole question is whether a municipal corporation was legally formed.   But it does not hold that this goes to jurisdiction or may be raised for the first time on appeal.   It does hold, and we do now, that, when the formation is merely emergent or incidental, a court of equity may pass upon its legality.   We hold further and now that the point is purely modal, and that it may not be raised first on appeal that the court of chancery acted and that *quo warranto* is the exclusive procedure.   See *Hogueland v. Arts,* 113 Iowa 634; *In re Receivership of Magner,* 173 Iowa 299, at 313.

3. SCHOOLS AND SCHOOL DISTRICTS: consolidation: size of remaining corporation: prohibition.

II.   One ground upon which injunctive relief was asked was that the formation of the Consolidated Independent School District left some subdistricts not taken into the consolidation with less than four government sections.   But the school township

in which said subdistricts lie had more than four government sections. The trial court held that, while a school corporation may not be reduced below four sections, this had no application to a subdistrict, and that no relief was due upon this allegation. We have so held repeatedly, and, therefore, affirm this ruling. See *School District v. Independent District,* 149 Iowa 480; *Consolidated Ind. School Dist. v. Martin,* 170 Iowa 262; *Lacock v. Miller,* 178 Iowa 920.

4. ELECTIONS: qualifications of voters: residence: schools and school districts.

III. The territory of the proposed consolidated district lies in Madison and in Dallas County. Three men voted for consolidation who have lived in said territory for more than 60 days prior to the time they so voted, but, on account of moving from one county into the other, neither had lived in the county where he resided when he cast his vote for 60 days prior to casting it. They had the right to vote, unless the fact that their residence in that county for less than 60 days before voting disqualifies them. The court held that they were disqualified.

The right to vote is a political and not a natural one, and if it is not conferred by law, it does not exist. The denial of it is completely justified if the Constitution requires a stated qualification, or the statute imposes one which is not in conflict with the Constitution, and the citizen lacks that qualification. Paine, Elections, Secs. 57, 58; *Morrison v. Springer,* 15 Iowa 304, 342; 10 Am. & Eng. Encyc. of Law, 568, 596–607; *In re Denny,* (Ind.) 59 N. E. 359; *Greenough v. Board,* (R. I.) 74 Atl. 785; *State v. Blaisdell,* (N. D.) 119 N. W. 360; 29 Am. & Eng. Encyc. of Law, 1075. Section 1, Article 2, of the Constitution provides:

"Every male citizen of the United States, of the age of twenty-one years, who shall have been a resident of this state six months next preceding the election, and of the

county in which he claims his vote, sixty days, shall be entitled to vote at all elections which are now or hereafter may be authorized by law."

Assuming, for the purposes of present discussion, that the vote taken on this proposed consolidation was an election, and we have the question whether the residence for 60 days is merely a direction to avoid fraudulent voting, facilitated by lack of personal acquaintance with those tendering a vote, or whether a residence for at least 60 days before the day of election in some county is one of the qualifications for voting at all—whether the lack of such residence is akin to the requirement as to age. Is the residence requirement merely a precautionary direction, or is it an essential qualification? Does it do no more than work that one who has not lived in the county the stated length of time ought not to vote, or should not be allowed to on challenge, or is the true construction that, if one does not have such residence, he can no more vote in any place in the state or for any purpose than if he were less than 21, or not a resident of the state for the prescribed length of time? *Langhammer v. Munter*, (Md.) 31 Atl. 300, *Fry's Election Case*, 71 Pa. 302, 306, and Dicey, Law of Domicil, page 55, declare it to be obvious that state residence and district residence are of the same nature, and whatever is necessary to constitute the one is essential to define the others. *Kreitz v. Behrensmeyer*, (Ill.) 17 N. E. 232, 253, holds if a voter abandon his residence in a voting district at a date too near the election for the requisite intervening time of the residence to be a voter in the new district to which he has removed, he will be entitled to vote in neither district. The required residence seems to be precisely equal to requirements like that as to age and being a male. *State v. School District*, (Neb.) 7 N. W. 315, 316; *State v. Boyd*, (Neb.) 48 N. W. 739. One must be an "inhabitant" to be a voter. *Baldwin v. Town of N. Branford*, 32 Conn.

47, 53; *Walnut v. Wade,* 103 U. S. 683, 693. Similar holdings there are as to qualifications by residence to render one competent to sign a petition to change the boundaries of a school district, and as to what constitutes a patron of a school with reference to signing a petition for relocation of the school. *School District v. School District,* (Ark.) 39 S. W. 850; *Willan v. Richardson,* (Ind. App.) 98 N. E. 1094. He is not a voter without having the prescribed residence. *Langhammer v. Munter,* (Md.) 31 Atl. 300, at 301; *Kreitz v. Behrensmeyer,* (Ill.) 17 N. E. 232, 253; *Carter v. Putnam,* (Ill.) 30 N. E. 681. We said, in *State v. Savre,* 129 Iowa 122, at 124, in approval of *Vanderpoel v. O'Hanlon,* 53 Iowa 246:

"He is entitled to vote only in the county where his home is, where his fixed place of residence is for the time being."

And in *State v. Minnick,* 15 Iowa 123, at 125:

"But a person may be a qualified voter, so far as age, residence in the state or county are concerned, and yet if he simply votes in the wrong township, he is clearly guilty of illegal voting, under Section 4337. It was the intention of the statute to confine voters to the township of their residence, and the disability attaches when they offer to vote in any other, as much as if they were not twenty-one years of age."

The words of the Constitution, that he "shall have been a resident * * * of the county in which he claims his vote," may have been written in oversight of the fact that, as to some elections and some voting, it should be immaterial that one claim a vote in a particular county. But though there was this oversight, it does not alter that, so far as the Constitution goes, it gives no right to vote at any election unless one claim the right to vote in a particular county, and has resided in that county for the specified time. It is no answer that one who lives in

either of several counties to be affected by an election has the same interest in the general result, no matter in which of the counties he lives.    There are some senatorial districts within this state composed of two or more counties. It will hardly be claimed that, if an inhabitant of the district should move from one county therein to another, and not reside within the county into which he removes 60 days before an election for senator is held, he might vote because he had been a resident of the senatorial district for more than 60 days prior to his voting.    So of one who has always lived in one county in Iowa up to his first removal, and who moves to another and distant county in the state.    Whether or no he shall have resided 60 days before election in the county to which he is moving or shall be in transit on the day of election, he is as much interested in who shall be elected governor as though he had never initiated a removal.    So far as his interest in the matter and natural right is concerned, there is no good reason why he should not vote at any polling place en route, or vote in the county to which he is removing, though he has lived therein only 59 days before election is held. The only reason why he cannot vote is that the only grant of power has, with or without good reason, a limitation requiring the 60 days' residence; that there are no equitable principles that can be applied; that the sole inquiry permitted is whether law has granted authority; and that the law is not obliged to see to it that all citizens have the right to vote somewhere at all elections.    *Kreitz v. Behrensmeyer*, (Ill.) 17 N. E. 232.

### 3-a

5. ELECTIONS: definition: voting on school consolidation.

We have assumed that the voting on the proposal to create a consolidated district is an election, within the meaning of the Constitution.    It is not an election as to which county lines are always material.

The voting we are considering could not be called either a Madison or a Dallas County election. It was, of course, no part of a general election. Section 2746, Code, 1897, creates an annual meeting of the voters of school corporations. Such meeting may be conceded to be an election, and there is express provision in Code Section 2747, that those who vote thereat must have the qualifications for voting at a general election. Section 2750, Code Supplement, 1913, provides for a special meeting of the voters of the corporation, which may also be conceded to be an election. So of the meeting of the voters of a subdistrict, provided by Code Section 2751. But all this does not make the voting upon consolidation an election. Such voting is neither the statutory annual meeting, the statutory special meeting, nor the statutory subdistrict meeting; nor is there a provision that in terms requires those who vote on consolidation to have the qualification for voting at a general election. And while one can vote only if he have qualifications exacted by law, a distinct question arises as to what one may do if no qualifications are exacted. We are not concerned with qualifications until we can find that there was an election to be qualified for. Undeniably, the term "election" is not given its broadest possible meaning in all cases, and is often restricted to a choice of public officers. Yet it has been held that a vote to determine whether or not intoxicating liquor may be sold is an election. *State v. State Board of Canv.*, (S. C.) 59 S. E. 145. *Seaman v. Baughman*, 82 Iowa 216, had the question whether voting at the annual meeting created by statute must be by ballot. It was argued that the Constitution provides that "all elections by the people shall be by ballot." It is in reply that we said that "elections," as used in this particular constitutional provision, was used less broadly than to signify choice, and was restricted to choosing public officers. It was significantly added that there is nothing in the an-

nual meeting statute to lead one to conclude that such meeting was an election, in the popular acceptance of the terms, and said as argument for the limitation that "judges of election are not provided for." Now, everything in Section 2794-a indicates that the legislature treated the vote on consolidation as an election. . Its reference to the call is that it shall be the duty of the board within ten days "to call an election in the proposed consolidated district." The next provision is, "at which election all voters residing in the proposed consolidated district shall be entitled to vote." The next reference is a statement of what "the judges of said election shall do. Next, there is a provision what shall' happen "if a majority of the votes cast by the electors" be a given way. The movement is to be initiated by a petition signed by "electors residing on such territory." The Constitution authorizes voters having certain qualifications "to vote at all elections which are now or hereafter may be authorized by law." Manifestly, this permits the legislature to create elections that did not exist when the Constitution was adopted. We have attempted to show that an election has been made out of voting on whether there shall be a consolidated independent district. Therefore, we are of opinion that such poll is an election, at least in such sense as that those who have the qualifications named in the Constitution may vote thereat. It is not necessary to determine whether, as to such an election, the legislature might not dispense with all or some of those qualifications. If this poll is not an election within the meaning of the Constitution, then the qualifications it prescribes are not requisite. But what does that accomplish? That a constitution does not impose restrictions on a vote is not so material as whether any law authorizes anyone to vote. The naked fact that one is an elector or a citizen is, of itself, no authority to vote, much less an authority to settle by an exercise of the voting franchise what the law

does not authorize to be thus settled,—to take part effectively in an election or an attempt at an election at which no law gives a right to vote. An elector may not be a voter. *Mills v. Hallgren,* 146 Iowa 215; *McEvoy v. Christensen,* 178 Iowa 1180; *In re Carragher,* 149 Iowa 225, at 227; *Gill v. Board of Com'rs,* (N. C.) 76 S. E. 203; *Oppegard v. Board of Com'rs,* (Minn.) 139 N W. 949; *Dorsey v. Brigham,* (Ill.) 52 N. E. 303. There is no rule of

6. ELECTIONS: right of suffrage: when nonexistent.

law that a man must be entitled to vote somewhere. *Kreitz v. Behrensmeyer,* (Ill.) 17 N. E. 232. Manifestly, there is even less natural right to vote for the purpose of accomplishing some particular object. On the theory that this poll is not a constitutional election, then, if the legislature has fixed no qualifications nor authorized voting without qualifications, no one was authorized to vote. Therefore, if we held with appellant that the constitutional qualifications were not necessary because this poll was not an election, it would profit him nothing, because we should be compelled to hold at the same time that the consolidation was not lawfully adopted because none who voted had by law been given the right to vote. But it

7. ELECTIONS: qualifications of voters: construction of statute: schools and school districts.

is not the fact that the legislature has done nothing. What it has done creates another angle of argument for the proposition that the qualifications prescribed in the Constitution were requisite, even though there was, in strictness, no constitutional "election." As to an election or referendum which is not such "election," the legislature may prescribe qualifications. Statutes authorizing women to vote on some questions have been upheld. Such work a dispensation with some constitutional requirements in cases which do not involve constitutional elections. It may well be said that, since the legislature is permitted by the Constitution to add to elections, that,

when it creates an additional election, that act itself adopts the constitutional qualifications, unless the legislature can, or at any rate does, dispense with some or all of them. Passing that, the legislature certainly can, as to such additional elections, expressly adopt the constitutional qualifications. Section 2794-a gives voting rights to "voters." The Constitution is the only Iowa law that gives a definition of voter, and part of it is that he is a person who has resided in the county where he votes for at least 60 days before voting. If the statute does not adopt this part of the definition by using the word "voter," then use of the word adopts no other part of the constitutional definition, and we must be prepared to say it was intended that, on consolidation, persons who were not 21 years old might vote. That this would otherwise result impels us to believe the statute adopts the constitutional qualifications by the use of the word "voter." We do not overlook that it requires the voter to reside in the district. The most that can be said for appellant is that, if "voter" means 60 days' residence in the county, it was tautology to add a requirement of residence in the district. To this there are what we think sufficient answers. (1) It were better to find that there is tautology than to find an intent to abandon universally well regarded safeguards of long standing. (2) There is no tautology. This proposed district lies in parts of Madison and Dallas Counties. If Section 2794-a had not limited voters to those who resided in the proposed district, any elector who had lived anywhere in either of the counties for more than 60 days before this vote was taken might have participated, though he did not live in any part of the counties in which the territory of the proposed district lay. The statute adopted all the constitutional requirements, and added what was needed for the special case being legislated for.

In our judgment, the court rightly held said three votes cast for consolidation to be void.

IV.   The court held that one Cook, who voted for consolidation, was not a resident of either Dallas or Madison County, and reached this conclusion by finding that, while Cook intended to become a resident of Madison County, the intention and the act did not concur.   Of course, residence is not established by naked intention, and intent and act must concur.   *Shirk v. Township Board,* 137 Iowa 240; *State v. Savre,* 129 Iowa 122.   But a careful analysis of what this rule means leads to the conclusion that it is well stated in the *Savre* case, 129 Iowa 122, wherein it is remarked that, if this were not the rule, one might gain a residence which he never saw by merely intending to dwell in it as a permanent abode.   But does this principle govern this case?   The cases make it one element for consideration that the party has not abandoned the residence he had before he claimed the new residence.   *Farrow v. Farrow,* 162 Iowa 87; 15 Cyc. 291; *Carter v. Putnam,* (Ill.) 30 N. E. 681.   Cook did not merely have an intention to become a resident of Madison County; did not merely entertain that thought while retaining his residence in Union County.   The first act he coupled with his intention was to abandon his residence in Union County, without intention to return thereto, with intent to reside in Madison County, in order to carry out an agreement with one Wilson, under which Cook was to live and work in Madison County.   He took to that county his family and all their goods, and took them and the goods to a house in Madison County wherein, under said agreement, he was to dwell, and while living in which he was to work in Madison County.   They reached it on the 23d of January, and found it occupied by one Kenworthy.   It is quite clearly apparent that Cook's employment was to begin on the

8. ELECTIONS: qualifications of voters: residence: intention: temporary inability to consummate.

first of March, and that Kenworthy was not obliged to yield possession of the house until then. This could not affect the intent and purpose which Cook then had. But Wilson, the employer, was somehow able to "furnish" room in that house in which to store Cook's household goods,—the house in which Cook and his family were to move to carry on the employment arranged for by agreement with Wilson. On consent, Cook stored his household goods in that house, and on January 23d. That is to say, he arranged to store his goods in that house until he had the right to all of it, a right which was then fixed by agreement with the owner of the house. After storing his goods, he and his family did not remain physically in Madison County, but, on January 23d, went into Dallas County to board and lodge with Cook's brother-in-law during the interim that Cook was compelled to wait in order to take possession. They took nothing into Dallas County except their clothing, and ate, slept and stayed there "most of the time." He did return on February 29th, and has since remained living in said house and carrying out the work under said agreement. All this seems to make quite plain that the storing the goods and the going to Dallas County was a mere temporary arrangement to bridge the time from January 23d until March 1st. The court held the residence did not begin until February 29th. We do not overlook that Cook as a witness indulged in general statements that "since then," meaning the time he left Union County, he lived in Dallas County, moved from that county into Madison County, and that, since February 29th, he has been living in Madison County. If the facts show that he began his residence in Madison County on January 23d, then he had the right to vote, and his said conclusions should not be allowed to overturn the facts to which we have called attention. Those facts, and not his deductions, must control.

Arriving in Madison County on January 23d, in the circumstances described, and doing what he did then, if he had in addition obtained board and lodging from the occupant of that house, or of someone else in Madison County living in the territory occupied by the alleged consolidated district, and in course of a week had found the lodging and board unsatisfactory, then, going to Dallas County and all that occurred until he returned to Madison County would not have made his vote illegal. He arrived on January 23d without a residence. He came there to carry out an intention to remain there and live and work there. He carried out this intention with every physical act that he had power to do. His going to board with his brother-in-law while waiting to get possession, intending to return and in fact returning as soon as he could get possession and go to work, involves to a certainty no change of intention that he had on January 23d, namely, to live and work in Madison County. His absence from Madison County was temporary, and for a temporary purpose, and with unchanged intent to return. Why, then, did he not gain a residence in Madison County as soon as he deposited his goods? An abandonment for the shortest time loses a residence, if there be no intent to return. *Kreitz v. Behrensmeyer*, (Ill.) 17 N. E. 232. On the other hand, a moving in may effect a residence in the first hour. *State v. Minnick*, 15 Iowa 123, at 126. If the purpose to remain is clearly proved, it is not fatal that a particular home is not occupied. Wharton, Conflict of Laws, Sec. 58; Story, Conflict of Laws, Sec. 46. It is of great materiality that there be a purpose to return. *Hinds v. Hinds*, 1 Iowa 36; *Kreitz v. Behrensmeyer*, (Ill.) 17 N. E. 232; *Love v. Cherry*, 24 Iowa 204; *State v. Savre*, 129 Iowa 122. Can there be question that Cook, who went to Dallas County so he might have board and lodging while waiting to take possession, intended to return? Naturally, it is not easy to find cases exactly in point on facts, but it

does seem as if there are cases which rule this. In *Kellogg v. Hickman*, (Colo.) 21 Pac. 325, one voter located on a pre-emption claim May 3d, and boarded with a relative, while building his house. He had left his home in Missouri some time before, and his family arrived in Colorado later in May, the exact date being uncertain, and they continued to reside on the claim from that time—and his residence was held to have begun on May 3d. And an unmarried man was held to have six months' residence, entitling him to vote at the November election, who sold out his business and left his former home, arrived in Colorado on the 3d of May, with intent to remain if he found a business to suit him. He examined different locations and selected one on the *15th of June*, being all that time at different places in Colorado, where all the property he owned was, after May 3d, excepting some debts due him at his old home, he registering at first as from his former home and afterwards as from a place in Colorado. In *White v. Tennant*, (W Va.) 8 S. E. 596, it is held that, where a person entirely abandons his former residence in one state with no intention of resuming it, and goes with his family to another residence which he has rented in another state, with the intention of making the latter his residence for an indefinite time, the latter state is his domicile, notwithstanding that, after he and his family arrived at the new residence, which is only about half a mile from the state line, they go on the same day on a visit to spend the night with a neighbor in their former state, intending to return in the morning of the next day, but he is detained by sickness until he dies, and never does in fact return to his new home.

4-a

Some cases that, on surface consideration, seem to sustain the ruling of the trial judge, upon careful examination rather militate against it. It is said in *State v. Minnick*, 15 Iowa 123, at 126, that one does not gain a residence

by coming to a place if he have no intention of remaining
and has the purpose of returning as soon as some tempo-
rary object is accomplished. And so of *Carter v. Putnam*,
(Ill.) 30 N. E. 681. It holds that one who rents a farm in
a township more than 30 days before election, but does
not move thereon at least 30 days before, does not become
qualified by the fact that, more than 30 days before, he
moved his corn plows, chickens, and a cupboard to the
farm, remaining a resident where he had resided. But it
is also said that, had he rented the farm 30 days before
election, and "gone upon it himself with a part of his
goods, and removed there, occupying the house as a resi-
dence until his family joined him on the 9th (less than 30
days before election), then he might with propriety claim
a residence from the date he went upon the place."

## 4-b

We come nearer to having the question of whether
Cook abandoned his residence in Madison County than
whether he gained a residence there on January 23d. Much
already said demonstrates that he did not abandon such
residence if he ever had it. An absence for months, or even
years, is not an abandonment if all the while intended to be
a temporary absence for some temporary purpose, to be
followed by a resumption of residence. *Kreitz v. Behrens-
meyer*, (Ill.) 17 N. E. 232. We say, in *State v. Savre*, 129
Iowa 122, that "mere bodily presence or absence cannot
have controlling effect in determining residence when once
established," and that "persons who travel for business or
pleasure for long or short periods do not lose their resi-
dence by such absence;" that "the vital inquiry, then, in
determining the residence of a person always is, Where is
his home, the home where he lives, and to which he intends
to return when absent, or when sick, or when his present en-
gagement ends." It was held, in *Carter v. Putnam*, (Ill.)
30 N. E. 681, that, where a man moved from Illinois to an-

other state in the spring of one year and returns to Illinois
with his family in April of the following year, if he has not
voted or done any act in the other state from which it
might be inferred he acquired a residence there, and he de-
clares he had no intention of staying there, he does not
thereby lose his residence in Illinois.   Surely, what Cook
did in Dallas County is, under this pronouncement, no
change of his rights in Madison County.   And see, as. hav-
ing more or less bearing, *Langhammer v. Munter,* (Md.)
31 Atl. 300; *Faires v. Young,* (Tex.) 6 S. W. 800; and *Smith
v. Thomas,* (Calif.) 52 Pac. 1079.   There is nothing in
*Church v. Crossman,* 49 Iowa 444, 447, that affects what we
have said.   Crossman was a resident of St. Lawrence Coun-
ty, New York, up to February 1, 1872.   From the middle to
the last of January of that year, he sold off his household
effects, preparatory to removing to Michigan.   Before Feb-
ruary 10th, he shipped all his goods, except clothing, which
he intended to carry in a trunk.   On February 10th, he and
his family went to his father's in Jefferson County, New
York, to stay until ready to go to Michigan, and stayed
there until February 13th, at which time Crossman did re-
move to Michigan.   It was held that, on February 2d, when·
he had not yet departed from St. Lawrence County, he had
not lost his residence therein, and that, therefore, summons
then and there served was effective.   In other words, the
mere shipping of goods to Michigan, and a visit to his father
for a temporary purpose, did not cause an abandonment of
his residence in St. Lawrence County.

In *Love v. Cherry,* 24 Iowa 204, residence in Iowa was
held not to be lost where a woman left Iowa to make a visit
or visits and transact some business, intending to return
in a convenient but uncertain time.   This intention was
never relinquished or abandoned, though subsequent devel-
opments rendered it necessary for her to remain longer
absent than she had expected.   In *State v. Deniston,* (Kans.)

26 Pac. 742, one who filed a homestead claim in Oklahoma and made a settlement and improvements thereon did not regain his former residence in Kansas by going there for a temporary purpose, intending to return to Oklahoma.

We do not disagree with the holding of *State v. Savre,* 129 Iowa 122, that, as to an unmarried man, "between the place where one rooms and sleeps and the place where he obtains his meals, without other facts indicating the contrary, the former must be regarded as his residence." But, self-evidently, the fact that Cook and his family ate and slept in Dallas County temporarily, and during the period that must elapse before they could return to the house in Madison County and get possession of same under existing agreement, does not bring this case within the rule announced in the *Savre* case.

If, on January 23d, inquiry had been made on the instant after the deposit of the goods by Cook, and while he and his family were still physically present in Madison County, as to where Cook intended to live, and then had a residence, and why he was going into Dallas County, it would surely have been found that he was presently to become a resident of Madison County, and would return and work there just as soon as the room provided for under existing agreement was available, and that he was leaving for the temporary purpose of obtaining a lodging until he could return. Clearly, a going into Dallas County in these circumstances was not an abandonment of his status in Madison County.

We think the court was in error in holding that Cook was disqualified.

V. On the face of the returns, the con-

9. APPEAL AND ERROR: parties who may allege error: nonappealing party.

solidation carried by four. The trial court held just four votes cast to be illegal, and upon this finding rests the relief granted. We hold it was erroneous to exclude one of

the four.    If this ends the inquiry, there must be a reversal. But appellee presents that at least three illegal votes for consolidation were held legal.    Though appellee has not appealed, and presents no error points, he has the right to urge that the judgment is right though some of the steps to reach it were erroneous—to show that errors against him so offset those made for him as to make the last nonprejudicial, and that, so, the final result is right.    See *Voorhees v. Arnold,* 108 Iowa 77, 85; *Kelso v. Wright,* 110 Iowa 560, at 565; *Royer v. King's Crown Plaster* Co., 147 Iowa 277, at 281; *Ford v. Dilley,* 174 Iowa 243, at 249; *Eisentrager v. Great Northern R. Co.,* 178 Iowa 713; *City of Beardstown v. City of Virginia,* 81 Ill. 541, at 547.

The trial court held one ballot valid which was cast for consolidation, and as to which appellee says that, while the one who cast it had the right to vote, he could vote legally only in Earlham, and was not entitled to vote "outside," which he did.

**10. ELECTIONS: qualifications of voters: residence: intention to return: temporary absences.**

He is unmarried and 23 years old.    His parents live in Earlham, and he was staying with them when, on March 6, 1916, he went into the employ of one Hall, who lives in the "outside" territory.    He voted on and for consolidation while working at Hall's.    The arrangement under which he went there to work was that, if both were satisfied, he would work until after threshing.    It was his expectation that, after that was done, he would go wherever he could get a job, and he says that, whenever he had failed, or should fail for a week or two, to get a job, he would go to Earlham, and that he regarded Earlham as his home whenever he was out of a job.    He "supposes" Hall's is his home, and adds, by way of conclusion, that he "had been making his home wherever he worked."    When asked why he didn't vote in Earlham, he answered, "Because they let me vote in the country."    While, on April 16, 1916, he went

from Hall's to vote on this consolidation, he went from the same place on the last Monday in March of 1916 to vote at the town election in Earlham. All that at all makes for a residence outside of Earlham is that he was assessed in Penn Township, and that, in 1915, he worked out a poll tax in Madison Township, which, at most, proves that he did not pay taxes in Earlham in 1915, and submitted to a tax levied in the outside territory. When he went to work for Hall on March 6th, he had been a resident of Earlham. That his going did not evince an intent to change his residence is made manifest by his voting in Earlham after he was at work for Hall. The nature of the employment did not change between the last Monday in March, when he voted in Earlham, and the 16th of April, when he voted "outside." He had not abandoned his residence in Earlham on the last Monday in March. Nothing indicates that he abandoned it later. All makes clear that the employment was a temporary incident to take him bodily for a time from Earlham, he intending and expecting to return home whenever his employment was at an end. All shows his home was always at Earlham. Therefore, the court was in error in holding he cast a legal vote when voting elsewhere than in Earlham. See *State v. Savre,* 129 Iowa 122. This works an affirmance.

VI. Appellee challenges two more votes for consolidation which the court held to be legal. It would be moot to decide this contention. If we should reach the conclusion the trial judge did, we must still affirm. If we did not, it would but accomplish that, to illegal votes enough to work an affirmance, more illegal votes would be added.

VII. Appellant presents a motion to strike some four pages of the argument for appellee from the files. The burden was on appellee, and he should have made, or at least had the right to make, the opening argument. He did not make it, and appellant did. Appellant invokes Section 44

of Rule 10 in this court, which provides that, in answering an opening argument made in these circumstances, the appellee must strictly confine his argument to matters in reply, and appellant asserts that these four pages were not strictly reply argument. We do not believe there was sufficient departure from essential reply argument to justify sustaining this motion to strike, and the same is overruled.

The decree must be and is—*Affirmed.*

GAYNOR, C. J., WEAVER, EVANS, PRESTON and STEVENS, JJ., concur.

LADD, J., concurs as to all but Division IV.

LADD, J., dissenting.—The authorities agree that two things must concur in order to constitute residence under the election laws: the fact of residence, and the intent that it be such. *State v. Savre,* 129 Iowa 122. As so employed, the word means "home" or "domicile;" a permanent abode or habitation, to which a party, when absent, intends to return. *Vanderpoel v. O'Hanlon,* 53 Iowa 246; *State v. Savre,* supra; *Hinds v. Hinds,* 1 Iowa 36. There must be a residence, and, in addition thereto, it must be permanent; that is, in the sense that the party, when absent, has the *animus revertendi.* Before one can be said to be a resident, he must have taken up his abode or dwelling somewhere, and abiding or dwelling is essential to constitute residence. Cook had abandoned his home in Union County, but his residence is presumed to have continued there until established elsewhere. No one claims that he became a resident of Dallas County, as his stay there was temporary. He had entered into an agreement to begin work in Madison County March 1st following. All claimed is that he, with his family and goods, went to the house he was to occupy, on January 23d, and found it occupied by a former employe. Bearing in mind that Cook was not entitled to possession or to his home there until over a month later, did his ar-

rangement with his predecessor to store his goods in a room of the house occupied by said predecessor, and so storing them, render him a resident at that place? He went away, and did not return with his family until February 29th, and, as I think, then, and not until then, established his residence there. Cook, as a witness, did not pretend to have been living in Madison County until February 29th. That he intended to move there in time to perform his contract, no one doubts, but I insist that there is nothing in the record before us warranting the inference that he ever became a resident, or that he ever took up his abode or dwelt in Madison County prior to February 29th, and, therefore, that he was not a qualified voter at the school election. Surely, the holding to the contrary renders easy the colonization of voters, and ought not to receive the approval of this court.

I dissent from the conclusion reached in the fourth division of the opinion.